Argued November 19, decided December 31, 1910.

## SLADE v. UTAH CONSTRUCTION CO.

[112 ' Pac. 433.]

APPEAL AND ERROR—REVIEW—VERDICTS.

1. A verdict of the trial·court is conclusive on appeal, where there is any evidence reasonably tending to support it.

MASTER AND SERVANT—EVIDENCE—SUFFICIENCY.

2. In an action against a railroad construction company for the price of grading on the right of way, evidence *held* to show that plaintiffs were employed by a subcontractor under the construction company, and not by the construction company.

From Baker:  WILLIAM SMITH, Judge.

Statement by MR. JUSTICE MCBRIDE.

This is an action by C. W. Slade and W. T. Davis against the Utah Construction Company, a corporation, to recover money alleged to be due upon contract. The facts are as follows:  In 1907 the Northwestern Railroad Company was engaged in constructing a railroad near Huntington, Oregon. The contract for grading the line was let as a whole to the defendant, Utah Construction Company, which sublet various portions to other contractors. For the purpose of the contract, the road was divided into "sections" of one mile each, and these were subdivided into "stations," each containing approxi-

mately 100 feet. The grading contracts were sublet by the construction company, either by miles or stations, and it was the custom of subcontractors of mile sections to again sublet to smaller contractors a separate section or more. When a "station man," as he was called, contracted directly with the construction company, he was paid upon the completion of his contract, and the same custom was observed with the mile section contractor. But in both cases supplies and wages for the men employed by the contractor were advanced by the construction company as the work progressed. The plaintiffs had been employed by the construction company on a certain piece of work, called "mile 13," and, after its completion, had some negotiation with defendant G. W. Straw, who was an independant contractor with the construction company, in regard to doing the grading work on mile 26 of the line, and Straw had agreed that, if they would undertake it, he would pay them twelve cents per cubic yard for earth work, thirty-three cents per cubic yard for loose rock, and seventy-five cents per cubic yard for gravel. Witness Davis, one of the plaintiffs, testified that he told Straw that he would let him know in two days whether he would take the contract; that, before taking the same, he saw Mr. Bowman, an agent of the Utah Construction Company, when this conversation occurred:

"Mr. Bowman * * asked me if I found anything that suited me yet, and I tells him Straw had a piece of work that looked good, and he said, 'Yes,' that was pretty good work. I told him I didn't like to mix up with Straw, though; and he told me to do the work, and he said: 'You will not have to. You get your stuff charged to Straw, and, when you get through, your classification and yardage, and get your money the same as station men.'"

The witness on redirect examination stated a conversation which he had with Bowman:

"I went up to headquarters along about the 12th, and saw Mr. Bowman, and I says to Bowman: 'Now will the books be closed on this contract we are going to take against Slade & Davis?' And he says: 'No; we can't close those books.' Then I says: 'We will take this work in Davis' name, and I won't be known in this contract.' And he says to take this work the same as station work and buy our stuff through Straw, instead of Slade & Davis, and, 'when you get through with this work, you will not have to wait for Straw's final. We will pay you the money the same as we pay station men.' "

On cross-examination the witness testified that Slade & Davis would not have taken the contract except for the assurances given by Bowman and that they were working with the understanding that their money was coming through the Utah Construction Company. The following question was asked witness:

"Q. Who were you working for, the Utah Construction Company or Straw?

"A. After we had this conversation we had, it was with this understanding that they had to pay us, and, if they didn't we wouldn't take it."

Witness further testified:

"That they had a contract on mile 13, and, whenever he wanted to pay a bill contracted by them on mile 13, he made out a time check or an order and signed it Slade & Davis, and that the party in whose favor the order was drawn presented it to the Utah Construction Company, who paid them the amount of the order and charged the amount to Slade & Davis.

"Q. And, after you went to work on mile 26, you never issued a time check signed Slade & Davis, but you had it signed by G. W. Straw in every case?

"A. Yes, sir.

"Q. After you went to work for G. W. Straw you never made out a check to any one?

"A. No, sir; he signed them.

"Q. And there was never one made by Slade & Davis?

"A. Mr. Davis made them out.

"Q. Who signed them?

"A. Mr. Straw.

"Q. You knew when you were working and contracting on your own account that you had authority to make them out?

"A. Yes, sir.

"Q. And you knew that when you were working for Straw, that Straw was the only one who had authority to make them out?

"A. Yes, sir.

"Q. And you knew that Straw was an independent contractor?

"A. Yes, sir.

"Q. And you were working for Straw?

"A. I knew that we were working under him and with the understanding that we were to be paid.

"Q. You knew that when Straw completed that work that Straw was to be paid for the work?

"A. Yes, sir.

"Q. And when Straw was paid for the work that you were to be paid for your work?

"A. Yes, sir.

"Q. You knew that then, and you know that, now?

"A. Yes, sir.

"Q. And it was two years after this work was done before you made any claim to the Utah Construction Company that they owed you a dollar?

"A. Right when we finished, and they told us to look to Straw.

"Q. They paid you for mile 13 after that?

"A. Yes, sir.

"Q. And you never made any claim for this work when they settled for mile 13?

"A. No, sir."

The witness then testified that he never commenced any action to recover the amount from Straw, and was then asked:

"And you never thought to collect it from the Utah Construction Company until two years afterwards?

"A. No, sir.

"Q. You admit that Slade & Davis were working for G. W. Straw, and not for the Utah Construction Company?

"A. We were working for the Utah Construction Company in a way. They told us to take this work.

"Q. What did they tell you?

"A. Said to take the work the same as station work, and as soon as we got through they would pay us our money without waiting for Straw's final, soon as we got through.

"Q. Who signed the orders to get the money to pay the men that were working for you?

"A. Mr. Straw.

"Q. In every case?

"A. Yes, sir."

Witness then stated that he understood the way that Slade & Davis took their contract, that the Utah Construction Company was standing good for the contract.

It further appeared from the testimony that Slade & Davis attempted to give notice of lien against the railroad company for this work, and that in the notice it was stated that they had been employed by Straw as subcontractors under the Utah Construction Company to do work in question. But witness Slade explained that he supposed this proper because they took the work from Straw. The witness then testified:

"Q. Who was present when you took the work from Straw?

"A. I think Mr. Davis and Mr. Straw talked that over, and Garland, a man who was working for us, was probably there at the time.

"Q. Was that the time you agreed how much you should be paid by Straw for the loose rock and dirt? Were the prices agreed on then?

"A. Yes, sir.

"Q. Between you and Straw and Davis?

"A. Yes, sir.

"Q. Between Slade & Davis on the one side and Straw on the other?

"A. Yes, sir.

"Q. But no one else was present except Garland?

"A. Yes, sir.

"Q. And you agreed on the prices then?

"A. Yes, sir.

"Q. As to how much you were to do this for?

"A. Mr. Davis made this contract with Mr. Straw.

"Q. In your presence?

"A. Yes, sir; some of it in my presence. I was on the buckboard, and held the horses, and Straw and Davis went over the work.

"Q. Did you notify him what prices you were to get from Straw?

"A. He asked me.

"Q. How much did you tell him?

"A. Told him twelve cents for earth and seventy-five cents for solid rock. For loose gravel I didn't know the price.

"Q. When did you tell Bowman that?

"A. I never told him about the rock or gravel. I simply told him twelve cents for the earth.

"Q. What did Bowman tell you?

"A. Told me to take it the same as station work.

"Q. What do you mean?

"A. He told me to take it the same as station work, and, when we got through with this work, they would pay the same as station work, and we would not have to wait on Straw for his final.

"Q. What did you understand by that?

"A. If we got through before Straw, we wouldn't have to wait until he finished.

"Q. Did you understand that Straw would pay you, or the Utah Construction Company?

"A. The Utah Construction Company.

"Q. And charge it to Straw?

"A. I supposed they would charge it to Straw.

[Witness then testified.]

"Q. And you knew when Straw gave an order to you or one of your men it would be paid and charged to Straw?

"A. Yes, sir.

"Q. Do you mean that this station work was not to be paid by Straw?

"A. I don't know. I know, if we got finished before Straw, Mr. Bowman told us that we would not have to wait for Straw's final.

"Q. When you would get an order from Straw for the work you had done?

"A. I supposed we would have to get an order from Straw. He didn't say that.

"Q. If you were to be paid by the Utah Construction Company, why did you get an order from Straw, why not give it yourself?

"A. For this work?

"Q. For any work?

"A. Straw had this work, and we had to get it through him.

"Q. And you had to look to him for your money, and the Utah Construction would help you to see that Straw would pay you?

"A. No; I understand that the U. C. Co. would pay it.

"Q. Whenever your work was done, you were to get an order from Straw for your money, and the Utah Construction Company would pay it?

"A. Yes, sir."                                    Reversed.

For appellant there was a brief over the name of *Mr. John F. Rand,* with oral arguments by *Mr. Rand* and *Mr. Andrew Hewitt.*

For respondents there was a brief over the names of *Mr. Samuel White* and *Mr. P. E. Cavaney,* with an oral argument by *Mr. White.*

Mr. Justice McBride delivered the opinion of the court.

1. The statement of facts preceding this opinion goes largely into the testimony introduced by plaintiffs, because, if any evidence was introduced by plaintiffs rea-

sonably tending to support their theory of the case, it is conclusive on this court after verdict. But in our opinion there is an entire absence of testimony tending to show an original contract with the Utah Construction Company. In its final analysis it amounts to this: G. W. Straw had a subcontract from the Utah Construction Company for constructing a certain portion of the grade of the Northwestern Railroad. Slade & Davis were negotiating with him for mile 26, embraced in his contract, and were told by the agent of the construction company to enter into a contract with Straw, and the railroad company would pay them as station men were paid; that is, that the work on mile 26, which they were to do, would be paid for just the same as the company had been in the habit of paying on small contracts or subcontracts for 100 feet of grade, and that they would not be obliged to wait until Straw's whole contract was finally finished and accepted before the money would be forthcoming. Slade & Davis knew at that time that Straw had the contract for this particular mile of work, and that the construction company was bound to pay Straw for it, and could not legally contract with any one else to do it without Straw's consent. With this knowledge they entered into a contract with Straw to do the work for him at prices fixed by him and themselves, the complete details of which were never known to the Utah Construction Company. The supplies were charged to Straw, every time check was signed by Straw, and there is not a single syllable of testimony indicating that Straw knew or suspected that Slade & Davis were working for the Utah Construction Company and not for him. Suppose Slade & Davis had refused absolutely to finish their contract and had quit without cause, leaving it half completed; would not Straw have had an action for damages against them, and could they have successfully defended by say-

ing that the Utah Construction Company was their real employer? Certainly not. Or suppose that they had abandoned the contract without completing it, and the Utah Construction Company had attempted to bring an action against them for damages. They could lawfully have answered:

"You let the contract for mile 26 to Straw and agreed in writing to pay him for it. You had no right to let it to anybody else. You told us to contract with Straw and we did so. If you are injured in any way, you must look to Straw, the man you told us to work for—the only man who had the right to say who should grade this particular mile of road. We looked to you for the pay, but you must look to Straw for the work. He is your original contractor."

It is plain that in such a case the construction company would have no standing in court. There is nothing in the evidence to indicate that it was a matter of the slightest advantage to the construction company that Slade & Davis should do the work rather than Straw or any other subcontractor.

2. A fair test of the question as to who was the real employer, the principal in the transaction, is afforded by the foregoing illustration. The Utah Construction Company would have no remedy in damages occasioned by a failure on the part of Slade & Davis to complete the grading on mile 26, while Straw would have had such remedy, and the conclusion is irresistible that the construction company was not the original contractor with Slade & Davis, and, in fact, not a contractor in any sense of the word unless an oral guaranty, void under the statute of frauds, may be termed a contract. The agreement, if any was made, was merely collateral; and that the plaintiffs so considered and treated it is shown by their attempt to create a lien on the road in the notice of which they set forth that the work was performed by them for Straw.

This case does not come within the reasoning of the case of *Balliet* v. *Scott*, 32 Wis. 174, cited by counsel. In that case, Scott, the defendnant, entered into a contract with Doton & Bennet, by which it was agreed that Scott was to pay the laborers employed by Doton & Bennet and deduct the amount so paid from the contract price agreed to be paid them. In pursuance of such authority from Doton & Bennet, Scott promised the laborers, before they went to work, that he would pay them, and the court held that the written agreement before mentioned was equivalent to an order by Doton & Bennet on Scott to pay them their wages as they became due, and that, when the laborers assented to this, it became a valid and binding contract. This was not an action between the laborers and Scott, but was a proceeding by an outside garnisher to attach the money which had been earned by them before process was served. It will be seen that in the above case there was held to be an agreement between Scott and the contractors and the laborers, making a complete contract. Here there is not the slightest evidence that Straw even knew of or agreed to, any arrangement between Slade & Davis and the construction company. Nor does it come within the rule announced in *Mackey* v. *Smith*, 21 Or. 598 (28 Pac. 974), where goods were delivered to one person upon the agreement of another to pay for them, no credit being actually given to the party who received the goods, although for convenience they were charged in his name, that case proceeding upon the principle that the person who received the goods was not liable to the vendor and that the person who ordered their delivery was the sole debtor. Under the facts in that case, the vendor could not have recovered from the person to whom the goods were delivered. Here Slade & Davis had and still have a complete cause of action against Straw, and, in fact, have joined him as a defendant in this action, though he has not been served

with summons. The case last cited and *Miller* v. *Lynch*, 17 Or. 61 (19 Pac. 845), so completely define the difference between original and collateral contracts that further citation of authorities seems superfluous.

We do not think there was any testimony in this case showing an original contract on the part of the Utah Construction Company, and for that reason the judgment of the lower court is reversed, and a new trial ordered.

REVERSED.